## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

JOSHUA L. FOLKERS,              )
                                )
          Plaintiff,          )
                                )
   v.                         )
                                )
PENNSYLVANIA HIGHER EDUCATION  )
ASSISTANCE AGENCY t/b/d/a AMERICAN  )
EDUCATION SERVICES, TRANS UNION LLC., )
EXPERIAN INFORMATION SOLUTIONS, INC.  )
AND EQUIFAX INFORMATION SERVICES  )        JURY DEMAND
LLC.                             )
          Defendants.     )

## COMPLAINT

## INTRODUCTION

1.    Plaintiff, Joshua L. Folkers, brings this action seeking redress against Pennsylvania Higher Education Assistance Agency t/d/b/a American Education Services, Trans Union LLC., Experian Information Solutions, Inc., and Equifax Information Services LLC. for violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq* ("FCRA").

## PARTIES

2.    Plaintiff, Joshua L. Folkers is a resident of Chicago, Illinois and resides in this District.

3.    Plaintiff is a consumer as defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681a (c).

4.    Defendant, Trans Union, LLC. ("Trans Union") is a credit reporting agency as contemplated by the Fair Credit Reporting Act, 15 U.S.C. 1681 *et seq*.

5.    Defendant, Experian Information Solutions, Inc., ("Experian") is a credit reporting agency as contemplated by the Fair Credit Reporting Act, 15 U.S.C. 1681 *et seq*.

6.    Defendant, Equifax Information Services LLC. ("Equifax") is a credit

reporting agency as contemplated by the Fair Credit Reporting Act, 15 U.S.C. 1681 *et seq*.

7.     Defendant,  Pennsylvania Higher Education Assistance Agency T/b/d/a American Education Services ("AES"), is a furnisher of information as contemplated by the Fair Credit Reporting Act "FCRA") 15 U.S.C. § 1681s-2(a) & (b), that regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions or experiences with any consumers.

## JURISDICTION AND VENUE

8.     This lawsuit, being brought pursuant to 15 U.S.C. §1681 *et seq*. presents a federal question and as such, jurisdiction arises under 28 U.S.C. § 1331 and 15 U.S.C. § 1681 *et seq*. This Court may also exercise supplemental jurisdiction over the related state law claims arising out of the same nucleus of operative facts which give rise to any federal law claims under 28 U.S.C. § 1367.

9.     All allegations and claims in this complaint stem from false and inaccurate credit reporting relating to plaintiff.

## GENERAL FACTUAL ALLEGATION

10.     Plaintiff had three student loans that were serviced by AES.

11.     AES is the loan servicer and agent of various National Collegiate Student Trusts, which own plaintiff's loans.

12.     In January of 2008, plaintiff received numerous daily calls and frequent letters from AES about payment due for a loan dated November 17, 2005.

13.     AES was not contacting plaintiff regarding his other two loans as its records showed those loans were deferred due to plaintiff being in school.

14.     Plaintiff sent a fax to AES on January 31, 2008 explaining that no payment should be due as to the November 17, 2005 loan as it should have been deferred.

15.    On May 3, 2008 plaintiff called AES to inform them that no payment should be due because plaintiff was currently enrolled in school.

16.    Even though AES had in its records showing that plaintiff's other two loans were deferred due to him being in school, AES informed plaintiff that he should contact the school attended and verify his enrollment. Plaintiff states that he contacted Phoenix College and requested that enrollment verification be sent to AES.

17.    Plaintiff nevertheless continued to receive collection calls from AES. Plaintiff contacted AES again on April 15, 2008 and spoke to collection CSR Jackie. Collection CSR Jackie stated that AES had no record of enrollment for the loan account. Jackie informed plaintiff that he needed to send proof of enrollment to AES in order to update his account. Plaintiff states that he faxed a copy of his comprehensive Maricopa Community College transcripts to AES.

18.    On April 22, 2008 plaintiff called AES to verify that his account had been corrected. Plaintiff was informed that his account had not been updated. Plaintiff was told to request that Phoenix College send plaintiff's enrollment information to AES. Plaintiff contacted Phoenix College via phone the same day to request that verification of enrollment be sent to AES.

19.    Plaintiff states that on May 12, 2008, he received a letter from US Bank regarding his reserve line of credit. Plaintiff was informed that his $2000 credit limit had been reduced to $200 based on information US Bank had "received from Equifax."

20.    Plaintiff states that on May 14, 2008 he received a letter from AES informing him that the full balance of his loan bill was due. Plaintiff contacted the AES collection department noted on the letter via telephone.

21.    Plaintiff spoke to collections specialist Tyler. Plaintiff explained that he did not understand why only one of his three AES serviced loans was due for payment. Plaintiff asked collections specialist Tyler if AES could update his 11/17/05 loan using the information AES had

on file for the other two loans of his that it serviced. Plaintiff was told that he needed to pay the amount due. Collections specialist Tyler offered plaintiff two different payment options. Plaintiff explained that he did not want to pay the bill in question because he did not understand why it was due. Collections specialist Tyler informed the plaintiff that he should pay his bill to improve the situation. Plaintiff then began planning to pay the amount due, which plaintiff believed was $1,635.55 based on bills from February to May of 2008.

22.     On June 10, 2008 plaintiff paid AES $1,635.55 using online bill pay.

23.     On July 27, 2008 plaintiff received a bill from AES for $981.33

24.      October 16, 2008 plaintiff received a letter from AES again demanding payment in full for the balance of his November 17, 2005 loan. Plaintiff phoned AES and spoke to CSR Megan. Plaintiff explained that he was in school and that payments should not have been due because he was enrolled in school. CSR Megan informed plaintiff that he needed to fill out an "in-school deferment form" every semester, drop it off at school, and wait for them to send it in to AES. Plaintiff went to Truman College (Chicago) with a completed in-school deferment form and dropped it off at the registrar's office.

25.     Plaintiff called AES and spoke to CSR Tamika on November 17, 2008 to check that account had been updated. Plaintiff was told that the account had not been updated and that plaintiff should request a deferment form.

26.      On January 24, 2009 plaintiff dropped off his Spring 2009 in-school deferment form at the Truman College registrar's office.

27.      On February 22, 2009 plaintiff received a bill from AES for payment due. Plaintiff called AES to verify that they had received his deferment form. The CSR who the plaintiff spoke to stated that no deferment form had been received.

28.     On March 17, 2009 plaintiff dropped off another deferment form at Truman

College.

29.     On July 14, 2009 plaintiff received a bill from AES even though he was enrolled in summer school. Consequently, plaintiff began to make monthly payments on the loan to prevent further credit reporting.

30.     On August 6, 2009, plaintiff called AES and spoke to CSR Jenny. Plaintiff requested information about the November 17, 2005 loan. Plaintiff was told that he needed to update his deferment for this loan each semester, and that nothing else could be done. Plaintiff was told that he was required to make payments if a month passed between semesters. Plaintiff asked if he could speak to someone about the negative credit reports that had been posted regarding the loan. When CSR Jenny returned to the line, she informed plaintiff that "It's your responsibility to keep the account updated." CSR Jenny informed plaintiff that the "negative credit reporting will remain for seven years, nothing can be done."

31.     Plaintiff wrote a letter to AES President and CEO Mr. James Preston on August 10, 2009. Plaintiff explained that CSRs and collection reps had been less than helpful in explaining why plaintiff's November 17, 2005 loan had been treated differently from his other AES serviced loans. Plaintiff states that AES received said letter on August 11, 2009.

32.     On or about August 22, 2009, plaintiff received a voice mail from Ms. Susan Pattison, "Account Research Specialist," calling "on behalf of Mr. Preston. The voice mail message stated that plaintiff's letter had been received, and that plaintiff should call Ms. Pattison if he needed anything.

33.     On September 3, 2009 plaintiff telephoned Ms. Pattison. Plaintiff informed Ms. Pattison that he had received her message and that he wanted to check the status of Mr. Preston's response to plaintiff's August 10 2009 letter. Ms. Pattison stated that plaintiff's account was being reviewed and that she would inform plaintiff when the review was completed. Ms.

Pattison stated that she was "working on [plaintiff's] case" and that plaintiff could contact her if he had any questions or concerns. Ms. Pattison informed plaintiff that she would "keep [plaintiff's] file" at her desk to update as needed.

34.     On September 15, 2009 Ms. Pattison contacted plaintiff via telephone. Ms. Pattison informed plaintiff that a letter would be sent to him that day, and that plaintiff should receive it soon. Ms. Pattison offered to read plaintiff the letter over the phone. Plaintiff declined, but asked Ms. Pattison to summarize the contents of the letter. Ms. Pattison explained that plaintiff's November 17, 2005 loan (known as "Loan 1") had gone into repayment status because it had not been updated . The last school on record for the Loan 1 was the school plaintiff attended when the loan was applied for. Ms. Pattison instructed plaintiff to contact the unaccounted-for schools and request enrollment verification from them.

35.     Yet,  AES response is inconsistent with its handling of the other two loans, which were properly categorized as deferred due to enrollment.

36.     On September 15, 2009 plaintiff sent a fax to Phoenix College requesting that enrollment verification be sent to AES - Attention Ms. Susan Pattison. Plaintiff also requested that Phoenix College contact him either by phone or by mail to confirm that plaintiff's request had been completed.

37.      On September 18, 2009 plaintiff telephoned Ms. Pattison to ask if she had received plaintiff's enrollment verification. Ms. Pattison stated that the verification had been received and that plaintiff's account would now be updated. Plaintiff requested that the late payments be removed when the account was updated. Ms. Pattison informed plaintiff that she would put in his request and inform him of the result.

38.     On or about September 20, 2009, plaintiff received a letter from Ms. Stephanie Foltz of AES. The letter stated that "...AES' records verify that the unfavorable

information was reported accurately in accordance with the Fair Credit Reporting Act."

39.     On October 3, 2009 plaintiff sent a fax to Ms. Stephanie Foltz in response to her September 9 2009 letter requesting that the negative reports be removed from his credit.

40.     Plaintiff telephoned Ms. Pattison on various occasions between October 4, 2009 and October 30, 2009 to request status updates. Ms. Pattison stated that plaintiff's request had to go through numerous parties and that it was not finished. Plaintiff was informed that Ms. Pattison would be going on vacation until Christmas time and Ms. Alicia Brubaker would be handling plaintiff's concerns.

41.     On or about November 10, 2009 plaintiff received several notices from AES with conflicting information on status updates for his account. Some of the notices stated, "deferment granted," while others state "deferment removed."

42.     On or about November 15, 2009 plaintiff received a message from Ms. Alicia Brubaker. Plaintiff returned the call and was informed that his request had been denied again and that a letter would be sent to plaintiff.

43.     On November 19, 2009 plaintiff wrote a dispute letter to Experian requesting the negative credit reporting be removed. Experian received said letter on November 25, 2009.

44.     On or about December 7, 2009 plaintiff received a letter from AES dated November 23, 2009, and signed by Ms. Shelly Bowman. Said letter stated that plaintiff concerns had been forwarded to "NTC for review" and that, after "sincere consideration...AES has not been authorized to issue credit retractions since the enrollment information...was not received in a timely manner." Said letter also states, "AES understands that you dispute the unfavorable information submitted from February 2008 - May 2008 and from July 2008 - August 2008."

45.     On December 7, 2009 plaintiff wrote a letter to Ms. Shelly Bowman requesting clarification of the changes made to plaintiff's account because plaintiff did not

understand the November notices he had received. AES received plaintiff's letter on December 10, 2009.

46.     Plaintiff wrote a letter to Transunion disputing the negative AES information and requesting it be removed. Transunion received the letter on December 18, 2009.

47.     On December 20, 2009 plaintiff received a letter from Experian. Said letter states that plaintiff's account had been "updated."   Yet, all the AES late payment reports remained on his credit report.

48.     On December 21, 2009 plaintiff again wrote a letter to Ms. Bowman of AES. Plaintiff asked for clarification of the fact that Ms. Bowman's November 23 letter only mentioned a portion of the months plaintiff had disputed. Plaintiff asked Ms. Bowman for a letter stating that no balance was due on the 11/17/05 loan in the months following September 2008. AES received the letter on December 24, 2009.

49.     On December 21, 2009 Plaintiff contacted Experian via telephone to verify that AES was contacted as pert of plaintiff's dispute process. Plaintiff spoke to Gail at approximately 10 A.M. CST. Plaintiff was able to verify that AES had confirmed the negative reports on his credit.

50.     On December 21, 2009 at or around 10:30 A.M. plaintiff spoke to CSR Jaime at AES. Plaintiff states that CSR Jaime verified that AES had confirmed that the late payments were "valid at that time." Plaintiff asked Jaime for a method of verification. Plaintiff states that CSR Jaime put him on hold again and returned to say that those requests were accepted only in writing. CSR Jaime provided plaintiff with fax number (717) 720-2774.

51.     On December 21, 2009 plaintiff wrote another letter to AES directly disputing with the credit furnisher. Plaintiff requested information regarding the method of verification used in confirming the negative credit reports with Experian. Plaintiff faxed his letter to the number which CSR Jaime had given him, and also sent the letter certified mail on the same day. AES received the

faxed letter on December 21, 2009, and the mailed letter on December 24, 2009.

52.    On December 23, 2009 plaintiff pulled his credit reports. Plaintiff states that Equifax showed no late payments, but showed Loans 2 and 3 as "in dispute."

53.    On December 23, 2009 plaintiff sent a fax to AES to clarify the fact that Loans 2 and 3 were not in dispute. Plaintiff states that he informed AES that he was only disputing Loan 1.

54.    On December 23, 2009 received a response from TransUnion. All disputed late payments were still being reported.

55.    On December 31, 2009 at 11:50 A.M. CST plaintiff telephoned AES and spoke to CSR Barbara. Plaintiff states that he asked if AES had verified the dispute with TransUnion. Barbara verified that AES received TransUnion dispute on December 22, 2009. Plaintiff asked if AES had received his letter dated December 21, 2009.Barbara confirmed that AES had received the letter. Barbara also stated, "Your account has been forwarded to the legal department."

56.    On January 7, 2010 plaintiff received a letter from AES stating that "Information reported to each nationwide consumer agency was reported correctly due to a period of delinquency on the loans listed on the reverse side of the letter." The letter additionally states that plaintiff believes that this information is inaccurate, "...we need copies of any pertinent documents supporting..."

57.    On January 7, 2010 at 3:20 P.M. plaintiff spoke to Ms. LeeAnn Holinger, Senior Attorney for AES Legal/Compliance Department. Plaintiff informed Ms. Holinger that he was a borrower, and she immediately stated, "This is not the customer service department." Plaintiff informed her that he was aware that he was calling the legal department, and that a CSR had told him that his account had been forwarded to said department. Plaintiff states that he told her that he

wanted to speak to her to resolve his situation. Plaintiff states that Ms. Holinger confirmed that she understood that it "can be frustrating." Ms. Holinger took down plaintiff's information and stated that she would contact plaintiff the following day.

58.     On January 8, 2010 plaintiff received a phone call from AES at 11 A.M. CST. Plaintiff spoke to Ms. Bowman, Ms. Pattison, and Nicole, who was identified as Ms. Pattison's supervisor. Plaintiff was told that the conference call was in response to plaintiff's January 7, 2010 conversation with a legal department employee.

59.     On January 8, 2010 plaintiff again wrote a letter to AES summarizing the content of the call.

60.     On January 8, 2010 plaintiff also sent a request to AES via email, asking that AES reinvestigate plaintiff's negative credit reports. Plaintiff included a copy of his Equifax report, which showed no late payments, and a copy of his Experian report, which did show late payments. Plaintiff also included a copy of his telephone records, as well as the July 12, 2008 letter from US Bank.

61.     On January 8, 2010 at 3:15 P.M. CST plaintiff contacted Ms. Pattison by phone to verify her receipt of plaintiff's emails. Ms. Pattison confirmed that she had received them. Plaintiff further states that he told Ms. Pattison that it was he only required a response if AES failed to remove all AES related negative reports from plaintiff's credit history.

62.     On January 21, 2010 plaintiff received a telephone call from Ms. Pattison at approximately 11 A.M. CST.  Ms. Pattison said that a letter to the plaintiff had been completed and would be sent to him. Plaintiff requested that the letter be scanned and emailed to him that day. Ms. Pattison emailed plaintiff the letter at approximately 2:45 P.M. CST. Said letter is dated January 20, 2010.

63.     On January 22, 2010 plaintiff wrote a letter in response to AES's January 20,

2010 letter. Plaintiff faxed said letter to Ms. Pattison.

64.     On January 24, 2010 plaintiff wrote a direct dispute to AES. Plaintiff faxed said letter to the number he had been given on December 21, 2009.

65.     On January 28, 2010 plaintiff called First Marblehead at approximately 12 P.M. CST.

66.     First Marblehead is the authorized agent for the National Collegiate Trusts that own plaintiff's loan.

67.     Plaintiff spoke with a male who stated that First Marblehead was, "not the lender." Yet, he was able to look up plaintiff's information using plaintiff's Social Security Number, and stated that there were "no problems" with plaintiff's account. Plaintiff explained that he was concerned about the credit reporting about his loan and wanted to discuss the situation. Plaintiff states that the man took down plaintiff's telephone number and stated that plaintiff would be contacted by a member of the "management team" within forty-eight hours. Plaintiff never received said call.

68.     On January 29, 2010 plaintiff telephoned Ms. Pattison to confirm that she had received plaintiff's January 22, 2010 fax. Plaintiff states that Ms. Pattison told him that she had not seen the fax yet, but was able to locate it on her computer. Ms. Pattison stated that she would forward said letter appropriately (letter was addressed to Ms. Bowman). Plaintiff explained that he would like responses in writing to specific questions and that it appeared to plaintiff that he was receiving the same letter from AES over and over. Plaintiff states that Ms. Pattison indicated to him that she understood.

69.     On February 2, 2010 plaintiff contacted Ms. Pattison via telephone to request a conference call about his concern.

70.     On February 4, 2010 Plaintiff received a call from AES employees Ms.

Pattison and Ms. Bowman. Ms. Bowman cut the call short and informed plaintiff that his concerns had been "forwarded to our legal department" based on his January 22 2010 letter. Plaintiff asked how long it would be until he received a response from the legal department, and Ms. Bowman responded, "the end of next week."

71.     On February 4, 2010 plaintiff again wrote a summary of the telephone call and faxed said summary to Ms. Pattison and to the AES legal department.

72.     On February 7, 2010 plaintiff sent an email to Ms. Bowman following up on the status of his complaint. Plaintiff also requested more information about Ms. Hollinger's forwarding of plaintiff's concerns to Ms. Bowman prior to the January 8, 2010 conference call.

73.     On February 8, 2010 plaintiff sent an email to Ms. Hollinger. The content of said email was substantially similar to the content of the email referred to in complaint No.73.

74.     On February 9, 2010 plaintiff received a response from Ms. Bowman to his February 7, 2010 email. Said response informed plaintiff that Ms. Bowman was unable to provide him with any information regarding the status of his complaint.

75.     On February 16, 2010 plaintiff received an email from Ms. Bowman informing him that his account was still being reviewed.

76.     On February 16, 2010 plaintiff responded to Ms. Bowman's email. In his response, sent via email, plaintiff explained that he would be sending numerous emails that day, each with a copy of a different credit report. Plaintiff stated that the credit reports were from the same time period, but contained conflicting information about his credit. Plaintiff stated that the emails would contain requests for clarification of specific discrepancies.

77.     On February 25, 2010 plaintiff sent Ms. Bowman an email asking for a status update and expected response date. Plaintiff informed Ms. Bowman that the process was taking longer than necessary.

78.     On March 3, 2010 plaintiff received an email from Ms. Bowman stating that his account was still being reviewed.

79.     On March 4, 2010 plaintiff wrote letters to all three credit bureaus. Plaintiff provided Equifax and TransUnion with new information, e.g. contracts, enrollment information, etc.

80.     On March 9, 2010 at approximately 3:00 P.M.. Plaintiff contacted First Marblehead via telephone. Plaintiff spoke to CSR Jody. Plaintiff states that he gave her his Social Security Number and she looked up his account. Plaintiff explained his concerns about AES and his credit report. CSR Jody took down plaintiff's contact information and stated that someone from the "management team" would contact him within forty-eight hours. Plaintiff asked if he should expect a call by the end of the week, and CSR Jody confirmed that was the case.

81.     On March 11, 2010 plaintiff sent an email to Evan Kantor, Managing Director, First Marblehead. Plaintiff explained in said email that he had not received a response to his telephone inquiries, and asked if Mr. Kantor could assist plaintiff with addressing his concern. Plaintiff did not receive any response to his email.

82.     On March 16, 2010 plaintiff sent Ms. Bowman an email asking for a status update. Plaintiff copied Ms. Stephanie Foltz and Mr. James Preston. Plaintiff did not receive a response to said email.

83.     On March 23, 2010 plaintiff telephoned Ms. Bowman's office at AES. Ms. Bowman's outgoing voice mail message stated that Ms. Bowman was out of the office until Mach 30, 2010.

84.     On March 23, 2010 plaintiff sent an email to Ms. Stephanie Foltz to request help while Ms. Bowman was out of the office. Plaintiff received a prompt response which assured him that she would follow up, and copied her assistants.

85.     On March 24, 2010 plaintiff received an email from Mr. James Jarecki,

Senior Attorney, AES Legal/Compliance Department. Said email informed plaintiff that he was working on plaintiff's account, and to address communications to him in the future. Mr. Jarecki's email stated that he would have a response for the plaintiff within the next week.

86.     On March 31, 2010 plaintiff sent an email to Mr. Jarecki. Plaintiff still had not received a response from Mr. Jarecki at that time.

87.     On March 31, 2010 plaintiff received an email response from Mr. Jarecki. Said response stated that Mr. Jarecki offered resolution, and would remove all of the negative reports for the months after October 2008. In exchange, plaintiff would sign a waiver of his rights.

88.     On April 1, 2010 plaintiff sent a response to Mr. Jarecki via email. Plaintiff explained that he wanted all credit items removed plus accrued interest removed.

89.     On April 2, 2010 Mr. Jarecki responded to plaintiff's email. Mr. Jarecki requested that plaintiff provide documentation showing "timely notification" and proof of damages claims, etc.

90.     On April 2, 2010, Realty & Mortgage Co. confirmed in writing that it previously made an adverse action against plaintiff based on the TransUnion credit report indicating severe late payments relating to his CBC/AES/NCT Education Loan. According to Realty & Mortgage Co. the lease could not be finalized without further security and/or a more "creditworthy co-signer."

91.     After various additional correspondence, AES offered to remove plaintiff's negative credit reports, but would not reimburse plaintiff for his expenditures and significant time spent attempting to resolve this matter.

92.     Because plaintiff would not agree to waive his rights, AES continues to report the negative information even though it has actual knowledge that the loan should have been categorized as deferred just like plaintiff's other two school loans.

14

93.     Plaintiff has been damages as he has spent significant amounts of time attempting to resolve AES' credit report, has made payments on a loan that should have been deferred, has been denied credit on favorable terms and has suffered emotional and mental anguish, humiliation, anger and frustration, annoyance, and embarrassment as a result of the publication of the false derogatory reporting. Plaintiff has been strapped with a false history, causing mental anguish, emotional distress, frustration, humiliation, and annoyance.

### Facts Regarding TransUnion

94.     Plaintiff disputed his AES account with TransUnion at least twice with the second dispute providing detailed information for TransUnion to remove the negative information.

95.      According to TransUnion and as verified by plaintiff, AES verified the negative information relating to the November 17 , 2005 loan.

96.     TransUnion has continued to report the negative AES information on plaintiff's credit report.

97.     Upon information and belief and based on TransUnion's letters as well as plaintiff's calls to AES, TransUnion sent notice of plaintiff's dispute to AES.

98.     AES falsely verified the account information to TransUnion.

99.      TransUnion relied exclusively upon AES verification to determine that the item was accurate and did not request any documentation as to the trade line despite plaintiff's detailed dispute.

100.     TransUnion's reinvestigation was unreasonable as it only copied what AES informed it and failed to undertake any investigation of its own.

### Facts Regarding Experian

101.     As alleged above, plaintiff twice wrote Experian requesting that it delete the AES account.

102.    Experian advised plaintiff that the AES account was verified as correct by AES and would remain on his credit report.

103.    Upon information and belief and based on plaintiff's conversations with Experian and AES, Experian sent notice of the reinvestigation to AES.

104.    AES falsely verified the account information to Experian.

105.    Experian relied exclusively upon AES's verification.

106.    Experian's reinvestigation was unreasonable as it only copied what AES informed it and failed to undertake any investigation of its own

**Facts Regarding Equifax**

107.    As alleged above, plaintiff wrote Equifax asserting that the other AES loans are not disputed and should be corrected.

108.    Equifax advised plaintiff that the AES account was verified as correct by AES and would remain on his credit report.

109.    Equifax sent notice of the reinvestigation to AES.

110.    AES falsely verified the account information to Equifax.

111.    Upon information and belief, Equifax relied exclusively upon AES's verification.

112.    Equifax's reinvestigation was unreasonable as it only copied what AES informed it and failed to undertake any investigation of its own.

113.    Plaintiff has suffered damages as a result of the incorrect reporting and defendants' failure to correct the credit reports.

**COUNT I (Experian) - FCRA 15 U.S.C. § 1681 *et seq.***

114.    Plaintiff realleges and incorporates the above factual paragraphs herein.

115.    The appearance of the incorrect AES trade line was the direct and

proximate result of Experian's failure to maintain reasonable procedures to assure the maximum possible accuracy of plaintiff's credit report in violation of the FCRA, 15 U.S.C. § 1681 e (b).

116.    Experian negligently failed to maintain reasonable procedures to assure them maximum possible accuracy of plaintiff's credit report in violation of the FCRA, 15 U.S.C. § 1681e (b) and 1681o; alternatively Experian willfully failed to maintain reasonable procedures to assure the maximum possible accuracy of plaintiff's credit report in violation of 15 U.S.C. §§ 1681 e (b) and 1681n.

117.    Experian has failed to conduct reasonable reinvestigation of plaintiff's consumer disputes.

118.    Experian has negligently violated the FCRA, 15 U.S.C. §§ 1681i and 1681o; alternatively Experian has wilfully violated the FCRA, 15 U.S.C. §§ 1681i and 1681n.

119.    Plaintiff has suffered damages as a result of this violation of the FCRA.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff, and against Experian:

A.    Actual, statutory and punitive damages proven by plaintiff at trial;

B.    Attorney fees and costs pursuant to 15 U.S.C. §1681n; and

C.    Any other relief the Court deems just and proper.

## COUNT II (Equifax) - FCRA 15 U.S.C. § 1681 *et seq.*

120.    Plaintiff realleges and incorporates the above factual paragraphs herein.

121.    The appearance of the incorrect AES trade lines was the  direct and proximate result of Equifax's failure to maintain reasonable procedures to assure the maximum possible accuracy of plaintiff's credit report in violation of the FCRA, 15 U.S.C. § 1681 e (b).

122.    Equifax negligently failed to maintain reasonable procedures to assure them maximum possible accuracy of plaintiff's credit report in violation of the FCRA, 15 U.S.C. § 1681e

(b) and 1681o; alternatively Equifax willfully failed to maintain reasonable procedures to assure the maximum possible accuracy of plaintiff's credit report in violation of 15 U.S.C. §§ 1681 e (b) and 1681n.

123.    Equifax has failed to conduct reasonable reinvestigation of plaintiff's consumer disputes.

124.    Equifax has negligently violated the FCRA, 15 U.S.C. §§ 1681i and 1681o; alternatively Equifax has wilfully violated the FCRA, 15 U.S.C. §§ 1681i and 1681n.

125.    Plaintiff suffered damages as a result of this violation of the FCRA.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff, and against Equifax:

A.    Actual, statutory and punitive damages proven by plaintiff at trial;

B.    Attorney fees and costs pursuant to 15 U.S.C. §1681n; and

C.    Any other relief the Court deems just and proper.

**COUNT III (TransUnion) - FCRA 15 U.S.C. § 1681 *et seq*.**

126.    Plaintiff realleges and incorporates the above factual paragraphs herein.

127.    The appearance of the incorrect AES trade lines was the direct and proximate result of TransUnion's failure to maintain reasonable procedures to assure the maximum possible accuracy of plaintiff's credit report in violation of the FCRA, 15 U.S.C. § 1681 e (b).

128.    TransUnion negligently failed to maintain reasonable procedures to assure them maximum possible accuracy of plaintiff's credit report in violation of the FCRA, 15 U.S.C. § 1681e (b) and 1681o; alternatively TransUnion willfully failed to maintain reasonable procedures to assure the maximum possible accuracy of plaintiff's credit report in violation of 15 U.S.C. §§ 1681 e (b) and 1681n.

129.    TransUnion has failed to conduct reasonable reinvestigation of plaintiff's

consumer disputes.

130. TransUnion has negligently violated the FCRA, 15 U.S.C. §§ 1681i and 1681o; alternatively TransUnion has wilfully violated the FCRA, 15 U.S.C. §§ 1681i and 1681n.

131. Plaintiff suffered damages as a result of this violation of the FCRA.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiffs, and against TransUnion:

A. Actual, statutory and punitive damages proven by plaintiff at trial;

B. Attorney fees and costs pursuant to 15 U.S.C. §1681n; and

C. Any other relief the Court deems just and proper.

## COUNT IV - FAIR CREDIT REPORTING ACT (AES)

132. Plaintiff realleges and incorporates the above factual paragraphs herein.

133. AES was required under 15 U.S.C. § 1681s-2(b), to respond to the request for reinvestigation initiated by plaintiff by completing an inquiry into the facts underlying the trade-line and providing accurate information to the credit reporting agencies regarding that trade-line.

134. In the event that AES was unable to verify the information which it had reported, AES was required to advise the credit reporting agency of this fact.

135. Following the reinvestigation, AES reported the erroneous credit information with actual knowledge of errors, in violation of the FCRA, 15 U.S.C. § 1681s-2(b) and the general duties implied to all conduct of furnisher under 15 U.S.C. § 1681s-2(a)(1)(A).

136. Following the reinvestigation, AES reported credit information that was not in fact accurate, in violation of the FCRA, 15 U.S.C. § 1681s-2(a)(1)(B).

137. Following the reinvestigation, AES failed to notify the consumer reporting agencies to whom it reported credit information that the debt was disputed, in violation of the FCRA, 15 U.S.C. § 1681s-2(b) the general duties implied to all conduct of furnisher under 15

U.S.C. § 1681s-2(a)(3).

138.    AES negligently failed to put in place procedures to complete an adequate reinvestigation of disputed credit information in violation of 15 U.S.C. §§ 1681s-2(b) and 168io; alternatively AES willfully refused to properly put in place adequate procedures to reinvestigate the inaccuracies in plaintiff's credit report in violation of 15 U.S.C. §§ 1681s-2(b) and 1681n.

139.    Plaintiff has suffered damages as a result of this violation of the FCRA.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff, and against AES:

A.    Actual, statutory and punitive damages proven by plaintiff at trial;

B.    Attorney fees and costs pursuant to 15 U.S.C. §1681n; and

C.    Any other relief the Court deems just and proper.


Respectfully submitted,
Plaintiff

By: /s/ Keith J. Keogh
        His Attorney

Keith J. Keogh
Ainat Margalit
KEOGH LAW, LTD.
101 N. Wacker Dr., Suite 605
Chicago, IL 60606
312.726.1092/312.726.1093 (fax)


## JURY DEMAND

Plaintiff demands trial by jury.


/s/ Keith J. Keogh
    Keith J. Keogh

## NOTICE OF ATTORNEY'S LIEN

PLEASE TAKE NOTICE that plaintiff ,(hereinafter referred to as Claimant) has placed in our hands for suit or collection a certain suit, claim, demand or cause of action as a result of the actions of the defendant as set out in the attached complaint. You are hereby notified that said Claimant has entered into a contract with us to pay as compensation for services rendered in and about the prosecution of said suit, claim, demand or cause of action, a sum equal to our fees recovered by way of suit settlement, adjustment or otherwise plus expenses.

YOU ARE FURTHER NOTIFIED that by virtue of the Attorney's Lien Law of Illinois, Chapter 13, Illinois Revised Statutes, Section 14, as amended, we claim a lien to the extent of our interest, as above set forth in said claim, demand, suit or cause of action, which lien by virtue of said law, attached to any verdict, judgment or order entered and to any money or property which may be recovered on account of such suit, claim, demand or cause of action, from and after service of this Notice.

By:/s/Keith J. Keogh
           Attorney for Claimant